May it please the Court, A. T. N. Ballard on behalf of the Appellant, Gulf Island Shipyard. Your Honors, I want to start with the most basic of questions, why intervene? We've got a bench trial, findings of fact, and conclusions of law. Why should this Court intervene? I think it's very clear where clear error exists. This Court, that's why this Court exists, to review for clear error and intervene where clear error has been made. And we can parse the facts and the evidence all we want, but I think that clear error exists in this case is evident from the most simple of observations, Your Honors. We have two huge, 365-foot, 80-foot wide halls that are not under power that remain moored in a Category 5 hurricane until peak hurricane conditions exist. All right, I'm going to start where you started about clear error, right? When I read a case, first thing I do is look to see who the trial judge is, right? Yes, Your Honor. So when I look at a case and I see the trial judge is Judge Eldon Feldman, full of nonsense, he was president of the Bar, been on the bench a jillion years, had a half a jillion Amherst and Maritime cases, etc., etc., and all of that. But as you saw in the last 10 plaintiff cases, that's what we do. That doesn't mean that he can't make error. Sir . . . But it tells me he knew it wasn't a divorce case. And so, when there's a bench trial and there's all that evidence and you've got great lawyers in front of him, I'm just saying for me, you've got to push to show me that the judge, who's seen plenty of these, experienced not his first rodeo on the clear error. This is a law that can be a different deal, maybe, but on the clear error with a bench trial, I have to know Urswild Counsel made all these arguments in front of the court, etc., etc. So when the judge doesn't accept that, that to me is not synonymous with clear error. So I'm just sort of setting your roadmap, at least for one judge, anyway. I appreciate that, Judge Stewart. You're exactly right. And I, like you, have the utmost respect for Judge Fallon and was very excited to try the case in front of him. I would submit and direct Your Honor to fact finding number 2 on page 5 of his opinion. This is what Judge Fallon wrote after hearing the evidence. At about 1.45 p.m. early in the storm, the vessels along the lost ship bulkhead began breaking loose. And he's talking about the 14 smaller of varying berths and dimensions lost ship vessels that were categorically improperly moored. Why is that, Judge Stewart? And this is Judge Fallon's own words. At this time, the winds were from the north with speeds about 40 miles an hour, with gusts of 70 miles an hour, not yet maximum hurricane winds. The first tier of vessels, again speaking about the lost ship vessels, in the northernmost tier were not shielded from the north wind and were not adequately secured since the bow of the vessel in this tier abutting the bulkhead could not be properly secured to the bulkhead. And as a result, this tier broke loose and cascaded down, causing the other vessels to come loose and float freely southbound down the Hohmann Navigational Canal, and this is the words that really confounded me with his findings, in the direction of the warhorse and wild horse, the Gulf Island vessel, which we know were damaged and contacted by lost ship vessels. And for your Honor's reference, that is at ROA 1139. Those are his own words, Judge Stewart, and it goes to my point about where the clear error exists. It's a very simple observation. We have a Category 5 hurricane. My client did enough to moor two huge hulking hulls to peak hurricane conditions, and one of them critically remained partially moored. Now, could they have done a better job? Maybe they could have, but that relates to the analysis of the Act of God defense, which we briefed. But 14 lost ship vessels all broke loose at 40 miles an hour. How could they have done that? How could that be reasonable precautions? And how could that not suggest that there is just an overall clear error here in the way the trial court went about its conclusions of laws, whether it's the assessment of fault, whether it's the application of the presumptions, which as you noted, Judge Stewart, we got a lot of maritime cases. I love it. Back when I clerked on the Fifth Circuit, we were the bastion of maritime law. You've got interesting issues here of the Louisiana and Oregon and the Pennsylvania rules because I would submit, nobody's going to dispute, Mr. Morrison, fine lawyer, fine law firm, nobody disputes in the fact-finding support that everyone knows that when the lost ship vessels broke away, all 14 of them, the two Gulf Island vessels remained stationary for that entire time. That is a finding in the findings of fact. That impels the presumptions. And they can be rebutted. I don't think they were rebutted here. And the piece of evidence that you'll hear a lot of, I think, in the counter is these witness statements. That's not, there's no credibility determination on those witnesses, Your Honors. This was a bench trial. They were submitted. They were taken well before. They were read. There was no inflection. There's no credibility. The witness statements saying I didn't see something is not the same as I watched every minute and I know this didn't happen. I would submit if you credit the witness statements the way Judge Fallin seems to have credited them in his conclusions, then you can't award damages to anyone because the witnesses say nothing happened. But that's not the case. We know something did happen. Why do we know? And why do the presumptions exist? Because a lot of times in these unwitnessed accidents, if you will, Judge Stewart, the only thing you can rely on is the physical evidence, how the experts talk about it, and what the objective evidence shows. What's your best argument about Salvo? Excuse me? What is your best argument about Salvo? The Salvo? So my best argument on the Salvo is I don't think a district judge can say I'm going to refuse to award damages because they weren't significant. If the damages happened and we know they happened, Judge Haynes, because there was orange paint on them, and that was the whole theory of Lost Ships Marine Surveyor about how this happened, that vessel was contacted by the Betty Schwest. The Betty Schwest started at point A and it ended at point B, and the Salvo never moved. So, Your Honor, I think applying the presumption of the Louisiana, which should have been applied, 100 percent recovery on the Salvo. That also applies to the War Horse, which I don't quite understand, honestly and candidly, Judge Stewart, how Judge Fallon missed that one. The testimony from the surveyor, my surveyor was that he observed damage. The testimony from Mr. Glass, who was the Lost Ships Surveyor, at trial he testified one way. I'd impeached him on his deposition previously where he admitted that he observed fresh damage on the War Horse, which was the northernmost vessel on the western side, Judge Haynes. Again, the evidence was uncontradicted. That vessel remained moored the entire time and it had orange paint and fresh damage, ergo, application of the presumption. We were awarded no damages on that. We briefed that topic, same as the Salvo, Judge Haynes. And I think what you're going to hear a lot of is, well, Thomassey says, Thomassey says, Thomassey says. That's this engineer who comes on the scene two hours later. And for everything that Mr. Thomassey says, I think the only credible thing that we can locate in Judge Fallon's findings on that is that this northernmost here was completely unsupported. It was not properly moored. And that's what caused the cascading breakaway of 14 vessels in tropical storm level winds. That's per se negligent, in my opinion, Judge Stewart. And then when you hear Thomassey, Thomassey, Thomassey, I go back to my basic premise. Thomassey's opinion was, well, I did the analysis of Lost Ships mooring and their mooring system would withstand 125 miles an hour. We know as a matter of fact that didn't happen. And then on the other side, he critiques my client's mooring system by saying it wasn't enough. It would have failed at 76 to 83 miles an hour. We know that's incorrect because all of the testimony and the findings of Judge Fallon established that the two larger hulls that were not powered and couldn't have been moved around before the storm, one of them remained partially moored and the other only broke away in peak hurricane conditions. And Your Honors, I think that sort of segues into this assessment of fault. I would submit that based on the presumptions and the proper application of maritime law, that my client is completely free from fault and this Court could render in that direction. And we've briefed all that and I don't want to go over the particulars right now. But when we get to this weighing of fault, what to me is really shocking is when you start weighing the various factors and you have a failure to come up with a good pre-storm mooring plan. You have a violation of that mooring plan, which was deemed deficient by one of the experts. You have three vessels moored at the top of a 14-vessel stack in violation of their severe mooring plan and not sufficiently moored to withstand tropical storm winds. You have all of these things and somehow the fault allocation is 65-35. And Judge Stewart, when I first read that, I thought they had flip-flopped the numbers, to be honest and to be candid. And again, great respect for Judge Fallon. He's a beacon of maritime law. But if there's a clear error, I think this Court has to act. The act of God defense, I just want to touch on that briefly, it wasn't really addressed in the opinion and I think that's legal error because I don't have to be perfect in my approach in terms of the affirmative claims against my client, Judge Haynes. What I have to do is I have to take reasonable precautions. What did my client do in advance of the hurricane? They had commissioned a marine surveyor to make recommendations on how to moor these vessels. An expert. The expert gave them those recommendations, were followed. And what Judge Fallon used to critique that and say it was improper was a bunch of random post-hoc observations, which I go back to why I critiqued the expert, Thomas, to Judge Stewart. You well know we can hire an expert to say anything. But it's like the weatherman. At some point you have to wonder whether they're just guessing. He says, these vessels would have been moored up to 125 miles an hour. False. That didn't happen. These vessels would have broken away at 76 to 83 under what I analyzed. Didn't happen. I would submit that his entire analysis is flawed just based on those two simple conclusions. The presumptions, Your Honor, we briefed, but I think that relates to the clear error because I read to you Judge Fallon's conclusion at C-2, ROA 1139. I read that factual finding applied with the presumption, and I struggle to understand how you get to a 65-35 split, how the act of God defense is parsed over. Because again, we know as an objective fact, and this is the Lohr brothers case and Anderson Supreme Court, those four factors. We don't have other witness testimony, so that's not one of the factors, but the physical evidence presented at trial all, in my opinion, establishes clear error. The expert testimony analyzing such evidence. Everybody, both the lost ship experts and the Gulf Island experts, agree on some fundamental points. One vessel struck the other while stationary. There's a 21-foot gash in the lost ship vessel that is directly related to a pad eye on the Gulf ship vessel, and the only way that happens is if one of those vessels is moving quickly and is able to rip 21 feet. And then you get to the last factor in Lohr brothers, which is the plausibility and internal consistency of the witness testimony compared with the physical evidence, and I would submit, Your Honors, that's why the witness statements that seem central to Judge Fallon's conclusions don't carry water here. If everyone says, you know, we're going to have somebody ran a red light, the video shows somebody ran a red light, but one witness says he didn't run the red light, it's hard to credit that witness testimony. And so, with that, Your Honors, if there are any questions, I'd like to save the rest of my time for rebuttal. All right. Thank you, sir. Appreciate it. All right. Mr. Morrison, for lost ship. Yes, sir. Good morning, Your Honors. This is Kent Morrison on behalf of lost ship, real pipe in the city of Shwest. AT&T and I have known each other since middle school. I've been competing at everything since then. I don't know what the score is, but this is another one that we both care very much about. I like AT&T a lot. He's a fantastic guy and a great lawyer, but . . . The best days we have are when we have wonderful lawyers in front of us. I agree. I'd prefer that every single time. But I think as you saw his presentation, the entirety of AT&T's presentation was his disagreement with Judge Elden Fallon and Judge Elden Fallon's findings at trial. That's all this is. That's 100% of what his argument is. Well, no, I won't say that because as to Salvo, he says even if facts point to Salvo should have gotten something, Judge Fallon points to minimal damages, but he makes a very strong argument, minimal or not, Salvo should have gotten something. Well, it's a little bit of a mischaracterization. No, I'm just . . . Not by you, Judge. You said 100%. I just took you at saying 100%. No, no. So I stopped you at the 100% because that's not 100, but go back to wherever you were going to say . . . I was, and I apologize, I didn't make it clear. It was a little bit of a misrepresentation by Mr. Bullard. All right. If you look closely at Judge Fallon's opinion, he doesn't say there's minimal damage so the Salvo is out because there's minimal damage. He says that the minimal damage to the Salvo in comparison to the massive size of the Betty Schwest does not prove that the Betty Schwest caused that damage. He doesn't believe that the Betty Schwest at that size could have run in to the Salvo and created this very minor damage. That's an important distinction. That is a very important difference that Mr. Bullard didn't point out. He cherry-picked a little bit of one portion of what Judge Fallon said. I'm sure when he comes back up here on rebuttal . . . He may, he may, but I think I'm right on that issue. When you look at what this argument about from Gulf Island, the argument is about facts, and that's the common thread throughout, that the facts as Judge Fallon found them don't fit what Mr. Bullard would like you to find. Well, that is not a basis to overturn Judge Fallon's opinion. Judge Fallon heard there's a suggestion here that the entirety of the case was based upon just the fact witnesses and the fact witnesses alone. Well, those fact witnesses are very important. These are seamen that were in a vessel watching the entire event unfold. Every one of them testified that they did not see, they did see the vessels break away from La ship, but they didn't see and know that not a single one of those vessels. As a matter of fact, they were across the canal and said that the vessels were scraping across the dry dock that they were in. That wasn't it alone. They had video evidence, they had taken video on their camera that comported with their testimony. So you didn't have just witness testimony alone, you also had the video. In addition to that, you had expert witness testimony about the direction of the winds, and at the time of this breakaway, the direction of the wind was straight down the canal which would not push those vessels across to the other side. So you also had that objective testimony, and then you had the testimony from our expert, Mr. Thomassey. On the other side of the ledger, on Gulf Island's side of the ledger, the only real thing that they had, and it's ironic to me that Mr. Blart would say, well, you can get an expert to say anything, is they basically only had an expert. That's it. They didn't have any eyewitnesses to say we saw the vessels crash into the wild horse or the war horse. They didn't have anything other than a, and we've set it out in our brief, a geometrically impossible idea of how the two vessels could have come into contact with each other when the wild horse was affixed to shore. So it's important to look at each of these as you go through his different arguments. When you look at the Louisiana rule and the Pennsylvania rule, Judge Fallon was very particular in addressing those two rules and why they were not important, and the case law of this Court in the Fifth Circuit supports it. The Louisiana rule and the Pennsylvania rule are designed to fill evidentiary vacuums, to create a presumption where we don't know exactly what happened. Well, we had a treasure trove of evidence about what happened in this. Again, multiple eyewitnesses watching the matter unfold, their video, all of the other data that we had concerning the storm, the time of the breakaway, all the rest, that was all available to Judge Fallon so Judge Fallon could weigh that evidence and make a determination based upon that evidence, which is what the preference is. That's what the Fifth Circuit asked for, is to do that. So the idea that there was . . . that we needed these presumptions at all in general was false, and Judge Fallon pointed it out. They were superfluous as a consequence of the evidence that we had. In addition, the Louisiana rule separately is inapplicable because it is dependent upon an initial factual finding, that a moving vessel collided or alighted, I apologize, with a stationary object. And Judge Fallon took all of that evidence, considered those facts, and determined that that did not occur based upon everything that we discussed just a minute ago. Well, that's a factual determination that can only be overturned for clear error, and that means that the Louisiana rule doesn't apply. So there is no Louisiana rule application. Absent a determination that Judge Fallon was clearly wrong on his factual determinations, and that doesn't exist here. And why, again, the testimony from all of the members, the officers of the ELIN, was that they watched this occur and that the ECO vessels did not make contact with the wild horse or war horse. They had their video evidence that proved that same thing, objective video evidence, and we had our expert opinions that supported that. Next, when you turn to the Pennsylvania rule, the Pennsylvania rule, again, is superfluous so it's not necessary, but even if you were going to apply it, it doesn't change anything here. The Pennsylvania rule is an application where there is a statutory violation and a presumption of fault based upon the statutory violation. If there was a statutory violation, it's the breakaway itself, and Judge Fallon found that the two vessels broke away independently of each other. So the Pennsylvania rule would apply to both vessels, and in that circumstance you go back to the facts and you determine an allocation of fault. So the Pennsylvania rule doesn't really change anything. It was also curious to me that he was making this argument about all these errors in what Judge Fallon found, essentially suggesting that he didn't find negligence. Well, he did find negligence. He did find that we broke away that we shouldn't have broken away. He did find that the vessels came in contact with each other, and he assigned us 35 percent negligence. The principal part of Gulf Island's argument about reviewing all this is based on the premise that he hadn't found negligence with us. Well, he did. He found us at fault for those things. And when you're in that circumstance where you have this fact under these factual circumstances, you look to an allocation of that fault, and the allocation is based upon what the parties did. Both vessels broke away. That's fundamentally true. But then you look at what did the two parties do to prepare for this storm, and it's really of no moment at what speed one vessel broke away or another broke away. The issue that Judge Fallon was focused upon was the relative effort and the professionalism of the effort of the two parties. At trial, we put on evidence that 546 man-hours, 546 man-hours were expended by last ship preparing 14 vessels. It's a much harder thing to do than the two vessels from Gulf Ship to get ready for this storm. Sixty percent of that time was just affixing those vessels to shore. The vessels used a very definite pattern that our expert engineer, Bill Thomassey, testified is the right way to do this for this storm. New lines were used and new wire rope was used. It was a massive and very important and very good effort to get ready for this storm. By the way, last ship had never had a breakaway before in any prior storm utilizing this exact same technique, and that evidence was presented at trial. Now, Gulf Island argues, well, it broke away at a lower wind speed. I'll be honest, I think the only error in Judge Fallon's opinion is the forty miles per hour, because the wind speed at the time of the breakaway was 115 knots, but it doesn't matter and Judge Fallon explained that. When you have the wind come at the wrong angle, even though you have gotten yourself ready for 150 mile per hour winds, it may not matter. You'll be overcome, it'll break away. He looked in comparison at what Gulf Island did. Our engineer came and showed and proved that Gulf Island had used these blocks. They may look impressive in and of themselves in the picture, but they're not, because they sit atop gravel and they don't have any bite. They slide as soon as they're pulled upon. So that was improper. The photographs of the vessels immediately after the storm and before the storm revealed that they used worn lines that were improperly rubbing on one another, that were affixed poorly to the vessels. It was completely unprofessional. That's what the evidence was. That's what Judge Fallon got to see through that multi-day trial with all of those witnesses. In that circumstance, under the applicable law, he has every right to look at the two and say, who did the better job here? Because that's what the analysis is, right? That's why we make this weighing between these two parties and make a determination of fault between the two parties. In part, it is to reward those who make a good effort to try and make sure that they do everything to keep these vessels from breaking away and to look comparatively at the others who did the bare minimum. They got a surveyor to come in and tell them what to do, but then they used terrible lines. They did not use equipment that they were told to use. They were told to bring out some crawler cranes and attach those as well. They did not do that. I don't think it would have mattered at the end of the day. The judge got to weigh all that and in his estimation, after hearing all of the witnesses, after looking at the videos, after looking at the photographs, after listening to the competing experts, decide for himself, who do I think did a better job? Who tried harder, did more to try and avert this incident? He made his determination. That is a pure factual finding. There is no clear error. You can have a disagreement of opinion on that. You, judges, respectfully, could look at that and say, I might go 50-50 or I might go 65-35 the other way, but that's not the test to overturn what Judge Fallon did, one of the best maritime jurists that we have in the Eastern District of Louisiana. I'll turn now to the Act of God. There was a suggestion that Judge Fallon just dismissed and really didn't address the Act of God analysis. He absolutely did. He absolutely did. As he noted, prevailing on Act of God is a massively high burden. You have to show that you have done everything, and let me get to the quote, that the accident could not have been prevented by human skill and precaution and a proper display of nautical skill. That's James v. River Parishes, 686 F. 2nd, 1129, 5th Circuit, 1982. And also that, and I open quote here, you must have exhausted every reasonable possibility which the circumstances admit, Bungie Corp. v. the M. V. Fresnel Bridge, 588 F. 2nd, 790, 5th Circuit, again, 1977. So the standard is extraordinarily high. I tried three of these breakaway cases and Act of God cases the year that he and I tried this case in front of Judge Fallon. He addressed Act of God in each of those cases. He has not forgotten about the Act of God. As he noted in every case, prevailing on that, either for me, I didn't prevail on Act of God either, or ATN, is a near impossibility. If you break away, there's something that wasn't done exactly as it should have been done, and you have some fault. And that's what happened here. He addressed that absolutely. There is no entitlement at all for Gulf Island to an Act of God defense, especially when you go back to Judge Fallon's fact findings about the comparative effort that Gulf Island made or failed to make in reality in preparing for this storm. You then turn to, and I've addressed the salvo, Judge, you brought that up right away, so I won't get back to that, but there are two other areas in which they claim there was clear error. And let's think about this. Basically, Gulf Island is claiming there was clear error in every single aspect of Judge Fallon's findings. That seems unlikely and incredible. But they say with respect to the damages of the wild horse, there was clear error. Your Honors, I won't bore you with the details. There were any number of different damages that they attempted to claim. In particular, there were some rust damages, interior rust damages that they attempted to claim that when the experts came through it, the rust and the extent of the rust proved that it long predated the incident issue. It wasn't even possible. There were other aspects that Judge Fallon went through and he went through methodically each one where he found there was damage here, but there wasn't damage elsewhere because there was no evidence that was provided to him of a correlation between the two vessels colliding with each other and that damage. Same is true, well, somewhat different on the war horse. Mr. Bullard claimed that our expert admitted there was damage to the war horse and that how could Judge Fallon have found that there was not any, that is not what our expert admitted to. He admitted that there was damage to it, but he did not admit that there were any paint transfers between that vessel and our vessel which would suggest that it was made by the Betty Schwest. That's very important because the ECO vessels, those were the Edison Schwest offshore vessels, those were the vessels that were being stored at Laship, including the Betty Schwest, are an incredibly distinctive basically alarm orange. If there is a paint transfer, you are going to see it and it is going to be very evident. There was a competing disagreement between the two experts. Their experts said that this paint on here was evidence of orange. Ours said no, that's the undercoat which is more of a rust red and the judge made a judgment call and agreed with our expert. Again, that's a factual finding and that's not clear error. Finally, he disagrees with the damages that were proved with respect to the Betty, our vessel. Again, we presented evidence to our experts. They presented counter evidence against that from theirs and Judge Fallon simply agreed that we had properly proved up our damages and the damage that occurred to our vessel. Those two vessels came into contact with each other down the canal after they had both equally broken away. This determination by the judge is absolutely 100% unassailable. The determination that they broke away independently of each other is unassailable. The determination that they came into contact with each other down the canal is unassailable. His determination as to the fault is unassailable. It's all based upon his factual determinations at this trial. They are not clear error. They are supported by the facts. All that can be done and the only thing that you have been presented with today is an argument that there's another way to look at it. The case law is clear in that circumstance. There is no basis to overturn the judgment. I've got two minutes left. Do any of you have any questions that I can address? I'm pretty thorough. Okay. I appreciate it. Thank you very much for your time. I have no doubt that Mr. Bullard will have very good arguments on the other side of what I just said. Thank you, sir. Back to you, Mr. Bullard. I want to start, Judge Stewart, on the issue of clear error because one of Mr. Morrison's arguments about application of Louisiana rule, he says it's inapplicable because Judge Fallon said that they were both moving. This to me is the fundamental clear error or a fundamental clear error. If all of the evidence and all of the testimony says that the only way the damage to those two vessels could have happened is if one was stationary and one was moving, for the judge to conclude otherwise is clear error because the only evidence, and this is a point that Mr. Glass and Mr. Tulloch, both the marine surveyors agree on, the physical damage on the two vessels, the Betty Schwest and the Wild Horse, could only have happened with one of them stationary and one of them moving. So for Judge Fallon, for Mr. Morrison to defend Judge Fallon's findings and say, well, Louisiana rule doesn't apply because he found this, he cannot just disregard the only evidence in front of him. So I would submit that's a very good example of clear error. So he was bound by their testimony? He can either reject it in whole, but I don't think he can . . . if the only evidence is this is how the damage had to happen, he can't create his own theory. I don't think he is because he's not ruling on the evidence, Judge. He could potentially, I guess, dismiss and say neither side proved damages and I'm dismissing the whole case, but I don't think he can create evidence that doesn't exist. What's the evidence in what he said that shows he'll find something 180 degrees differently from the experts, as opposed to he heard it, you know, just because they're experts, et cetera, trial judges do that. I hear you, I'm just trying to . . . you put the experts up, fine. Good judges and even jurors, they hear it and say, yeah, I don't know. So I'm just saying why does that amount to . . . I know the why question is dangerous, but I'm saying it's just not inescapable that you put five experts up there and a juror says, yeah, and they do something else. Well, I mean, how did they get to be reversible error because they chose not to accept your well-paid, well-prepared hundred pages of resume expert? I think, Judge Seward, let me get directly to the point. I think it goes into the whole metaphysical physics of science versus theory. When both the marine surveyors say it would be physically impossible to explain this damage except this way, I think that's a hard piece of evidence for a district court judge to ignore. Maybe so. We get stuff all the time. I sit and look at it, hmm, I don't understand that. I mean, Judge Haynes was a trial judge, I was. We sit there and I've seen jurors come back with something, I don't understand that. But that's their job and I don't take it away. So I'm just saying it goes with the territory. You're entitled to a fair trial, but not a perfect trial. So . . .  That's axiomatic. So if you didn't get a perfect trial, then that's not clear error. If I Google it, it won't say that's clear error. And even if I concede that point, Your Honor, which I don't in my brief, but even if I concede that point, there's some major points that I think have to be considered in the clear error analysis. On the damage to the salvo, there's orange paint and new dent. That was undisputed. No, this . . . No, and I understand the causation. On the salvo piece, frankly, I got it. And the same applies on the war horse, ROA 1535. That's a testimony from Mr. Glass. Question, and we do know, or you agree, that the war horse exhibited evidence of starboard side damage to her while she remained alongside at Bollinger. His answer, yes. That's at 1536, line 14. The Betty Schwest, it was undisputed. Their own surveyor said, I included everything. The video showed this vessel bobbing and bouncing along with other lost ship vessels. There's port side damage that couldn't have happened even if she contacted one of my vessels. A hundred percent of the repair cost for that. I think that's patently sort of clear error. And then we get to the wild horse. I agree with Mr. Morrison. There was $95,000 that Judge Fallon took out. We're not contesting that. What we're contesting is he critiqued, and perhaps Mr. Judge Stewart, there was a lot going on. We submitted surveys. We didn't have live testimony. The surveyor said, my estimate went from $500 to $800 because I got an actual repair quote, and that's what it is. So I think, again, there's an instance of some clear error where the damage was cut without any basis in fact. And with that, Your Honors, I know there's a lot on your plate. I would suggest that there's a reverse in render, but I think a reverse and a back for a new trial to sort this out would also be adequate, and I thank you for your time. All right. Well, we appreciate it. As I said, our best day is having great lawyers to make the arguments, particularly ones that tried the thing below. We don't get metaphysical arguments from a felony specialist. It's down on the ground. I bet if I had a tape recording of the closing arguments in that trial, I'd be just spellbound. But we do what we do, and the trial judges do what they do. But nothing I said is to mean that Judge Fallon is impervious from error. That doesn't mean he's saying it. I just wanted to let you know the slope you had to kind of go up in order to show clear error, but we'll do what we do. We appreciate the briefing and argument in this case and the others that have been argued today. They will be submitted along with the other cases, and with that, the panel will stand in recess until 9 a.m. tomorrow. Thank you, Your Honor. Thank you, Your Honor.